## Case No. 10,329.

### NORTHRUP et al. v. SHOOK.

[10 Blatchf. 243; 16 Int. Rev. Rec. 196; 7 Am. Law Rev. 573.] [1]

Circuit Court, S. D. New York. Dec. 12, 1872.

BANKS AND BANKING—TAXATION UNDER INTERNAL REVENUE ACT—LICENSE—DEFINITION OF "BROKER."

1. Bankers, confining themselves to the business of banking only, as such business is described in subdivision 1 of section 79 of the internal revenue act of June 30, 1864 (13 Stat. 251), and which is not included in the business of a broker, described in subdivision 9 of said section 79 (Id. 252), as amended by the act of March 3, 1865 (Id. 472), are only liable to pay the banker's license fee and percentages mentioned in subdivision 1.

2. Such bankers, without any further or additional license or license fee, may transact the business of a broker described in subdivision 9, while the mere broker must pay $50 for his license. But, if a banker does business as a broker, he subjects his sales to the duties imposed by section 99 of the act of June 30, 1864 (13 Stat. 273).

3. A person who buys stocks in his own name, for his customers, for a commission, and advances the purchase money on the security of a percentage of such price, deemed sufficient, and deposited with him as security against loss, and sells the stocks for another commission, and settles the account according to the resulting balance to the credit of the customer, having no interest except his commissions and interest, or interest and commissions on his advances, the whole being at the risk, and for the account, of the customer, as to profit or loss, does business as a broker, within the meaning of the acts in question, and subjects his sales to the duties imposed by section 99 aforesaid.

4. Such duties thereupon become chargeable on all his sales, whether of his own property, or of the property of others coming to his possession, and held, for advances made by him as a banker, or purchased and sold on speculation for the account of others, on commission.

[Cited in brief in Anthony v. International Bank, 93 Ill. 227.]

5. Whether, when a tax is paid to a collector of internal revenue, without objection, or notice, in any form, that the party paying deems is erroneous, and the collector pays over the money

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission. 7 Am. Law Rev. 573, contains only a partial report.]

to the government. the collector is thereafter liable in an action to recover it back. and whether such an action, if maintainable, can be brought until after such an appeal to the commissioner of internal revenue as is required by section 19 of the act of July 13, 1866 (14 Stat. 152), quere.

[This was an action at law by Hiram M. Northrup and Joseph S. Chick against Sheridan Shook, collector of internal revenue, to recover taxes alleged to have been unlawfully assessed.]

Reverdy Johnson, Thomas W. Bartley, James R. Doolittle, and William H. Scott, for plaintiffs.

Noah Davis, Dist. Atty., and Luther W. Emerson, Asst. Dist. Atty., for defendant.

WOODRUFF, Circuit Judge. This action is prosecuted for the recovery from the defendant, who was, at the time of the transactions in question, the collector of internal revenue for the Thirty-Second district of the state of New York, of the sum of $20,830.19, alleged to have been erroneously assessed upon the business of the plaintiffs, and paid by them as taxes, from September, 1864, to and including the sum assessed for July, and paid August 31, 1866. The amount was assessed upon or for their sales of gold, stocks, bonds, bullion, bills of exchange, and promissory notes, between the dates stated. It is not claimed that the amounts of the sales upon which the assessments were made, or the rate of the tax assessed, were, in any respect, erroneous, if the plaintiffs were liable to assessment and tax upon the respective kinds or classes of business done by them, as hereinafter stated. The ground of the assessment was, that the plaintiffs were bankers doing business as brokers, within the meaning of section 99 of the act of June 30, 1864 (13 Stat. 273), as affected by subdivision 9 of section 79 of the same act, as amended by the act of March 3, 1865 (Id. 472), and were liable to tax upon all their sales of gold, stocks, &c., whether their own property, or the property of others. The plaintiffs insist that they are bankers only, doing business under a license as bankers, and not liable to taxation upon any of their sales; and that, although they made sales of the stocks, &c., belonging to others, which were taxed, they were therein acting as bankers only.

The sales in question were, as testified on the trial, of three kinds: (1) Sales of their own property. (2) Sales of gold, stocks, bonds, bullion, &c., transmitted to them by their correspondents, and the same or the proceeds drawn against. In some cases, the sales of the transmitted property were made immediately, and the proceeds at once applied to the payment of drafts so drawn, and, in others, the drafts were accepted or paid, and the gold, stocks, &c., were held for a better market, or to await further orders, and, in the meantime, stood as their security

for their advances, and to provide reimbursement therefor. In other cases, there were no actual advances, but the property was held for sale, and, when sold by order of the customer, the proceeds were placed to credit, subject to draft. (3) Sales of stocks made in pursuance of an arrangement for what is called carrying stocks on a margin, wherein they, upon the deposit with them of a percentage on the amount of the stock, advanced money and purchased stock, for the dealer or speculator (who dealt in the hope of making a profit by the rise in the market price), and held the same subject to his order to sell, and finally sold the same for his account as to profit and loss. These transactions were conducted in the name of the plaintiffs, the name of the customer not being disclosed to those from whom the stocks were purchased, nor to those to whom the stocks were finally sold. Upon these purchases and sales, they charged and received from their customers the usual commissions for purchasing and selling stocks for account of others, and the tax imposed and paid to the United States on the sales was also charged to such customers. If the transaction showed a profit, it was paid to the customer, with a return to him of the cash or security held as a margin. If the transaction resulted in a loss, the amount of such margin returned to the customer was correspondingly reduced. It may not be material to the legal questions involved, but it was a fact proved in the case, that much the largest portion of the sales upon which the tax in question was imposed were of the class thirdly above mentioned.

On the trial, it was insisted, on behalf of the defendant, that the plaintiffs were bankers doing business as brokers, within the meaning of the acts of congress relating to taxes on sales of stocks, &c., and that, as such, they were liable to taxation upon all their sales, whether made for themselves, and of their own property, or made for others upon a commission; also, second, that, whether the tax was or was not properly assessed, the amount paid therefor could not be recovered back in this action, because it was a voluntary payment, not made under any duress, of goods, or otherwise, that, the defendant being a public officer, and the tax being assessed and returned to him by the assessor, he collected it and paid it over to the United States in the due discharge of his official duty, without notice of the particular character of the plaintiffs' business, or of the nature of the sales so assessed, and without any notice, protest, or objection made to him by the plaintiffs, that the assessment was, or was claimed by them to be, illegal, or, in any respect, erroneous, citing, in support of this, Elliott v. Swartwout, 10 Pet. [35 U. S.] 137, and Bend. v. Hoyt, 13 Pet. [38 U. S.] 263. decided before the act of congress of February 26, 1845 (5 Stat. 727), requiring a written protest when

duties on imports are erroneously exacted; Lawrence v. Caswell, 13 How. [54 U. S.] 488; [Band v. Hoyt, Id. 267];[2] Nichols v. United States, 7 Wall. [74 U. S.] 122, decided subsequently to that statute; and U. S. v. Clement [Case No. 14,815],—and that, although, in course of the payments, but at what date is not shown, the plaintiffs, or one of them, repeatedly objected, to an assistant assessor, that the plaintiffs were not liable to these taxes, and remonstrated with him, and received from him an assurance that, if the tax was illegal, it would be refunded, still they made no objection to the defendant, nor claimed before him, by notice, protest or otherwise, that the assessment was illegal; and, third, that, although it was proved that the plaintiffs did, in or after April, 1869, make an application to the commissioner of internal revenue to have the amount of the taxes in question refunded to them, there is no proof of any such appeal as the act of congress of July 13, 1866 (14 Stat. 152, § 19), requires, and, for that reason, this action cannot be maintained.

I. The first, and, in respect of importance, the principal, question is, whether the plaintiffs were liable to the tax assessed and paid.

The provisions of the acts of congress, which are to be construed in deciding that question, are the following: The act of June 30, 1864, § 110 (13 Stat. 277), which imposes a duty of $1/_{24}$th of 1 per cent., each month, on deposits, $1/_{24}$th of 1 per cent., each month, on the capital, $1/_{12}$th of 1 per cent., each month, on the circulation, and an additional $\frac{1}{6}$th of 1 per cent., on certain specified excess of circulation; these are required of "any bank, association, company, or corporation, or person, engaged in the business of banking, beyond the amount invested in United States bonds." Section 79, subd. 1, of the same act (Id. 251), declares, that "bankers using or employing a capital not exceeding the sum of $50,000 shall pay $100 for each license," and, for every additional $1.000 of capital, $2; and that "every person, firm or company, and every incorporated or other bank, having a place of business where credits are opened by the deposit or collection of money or currency, subject to be paid or remitted upon draft, check or order, or where money is advanced or loaned on stocks, bonds, bullion, bills of exchange, or promissory notes, or where stocks, bonds, bullion, bills of exchange, or promissory notes are received for discount or sale, shall be regarded as a banker, under this act." Section 79, subd. 9, of the same act (Id. 252), as amended by the act of March 3, 1865 (Id. 472), reads as follows: "Brokers shall pay $50 for each license. Every person, firm, or company, except such as hold a license as a banker, whose business it is, as a broker, to negotiate purchases or sales of stocks, exchange, bullion, coined money,

bank notes, promissory notes, or other securities, for themselves or others, shall be regarded as a broker, under this act. * * * Provided, that any person holding a license as a banker shall not be required to take out a license as a broker." Section 99 of the same act (Id. 273) provides, "that all brokers, and bankers doing business as brokers, shall be subject to pay the following duties and rates of duty upon the sales of merchandise, produce, gold and silver bullion, foreign exchange, uncurrent money, promissory notes, stocks, bonds, or other securities, as hereinafter mentioned." Then follows a specification of rates, and a proviso, prohibiting sales, by any one not licensed as a broker or banker, of any stocks, merchandise, &c., not bona fide his own property and actually on hand.

Under these provisions, it is, I think, clear, 1st. That bankers confining themselves to the business of banking only (as such business is described in subdivision 1 of section 79, and not included in the business of a broker described in subdivision 9), are only liable to pay the banker's license fee and percentages mentioned in subdivision one.

2d. That, without any further or additional license, or license fee, they may transact the business described in subdivision 9 of the same section, while the mere broker must pay $50 for his license. This subdivision, by plain implication, contemplates and authorizes bankers, if they see fit, to engage in the business described as the business the transaction of which makes a man a broker, within the meaning of the act.

3d. Section 99 recognizes this construction of the section last referred to. It assumes that bankers may transact the same business for which the broker pays his license fee, and, therefore, declares, that "all brokers. and bankers doing business as brokers, shall be subject" to duties on sales, &c., at rates specified.

4th. Here is no involuntary double taxation. So long as the banker confines himself strictly to the business of banking, he pays for that, and on his business, specified license fees and duties, and nothing more. If, however, he sees fit to engage in the business described not as the business of a banker strictly, but coming, also, within the business of a broker, he then subjects his sales to the duties imposed by section 99.

5th. The distinction between the conditions upon which license fees are paid, the amounts of such license fees, and the classes by whom they are payable, on the one hand, and the general declaration, in section 99, as to what sales shall be subject to duty, is to be borne in mind, in giving a construction to this latter section. The section is not confined to the brokers described in subdivision 9 of section 79, as seemed to me to be assumed on the trial. It includes sales of merchandise and produce, as well as of gold, stocks, bonds, and other securities mentioned

in the subdivision last named, and so it includes produce brokers, and commercial brokers, and, perhaps, some others (subdivisions 13, 14, etc., § 79 (13 Stat. 252, 253); and it, therefore, brings into view all sales by brokers of any kind, made of "merchandise, produce, or gold and silver bullion, foreign exchange, uncurrent money, promissory notes, stocks, bonds, or other securities."

6th. It is obvious, that, if the sales of these various descriptions of property could be made for others, and for a commission, by bankers, under cover of their license, (they having been expressly relieved of the duty to take a license as brokers,) the whole business of selling merchandise, produce, gold, stocks, bonds, &c., might be done by those who hold such a license, and that those whose constant employment it is to make such sales for others for a commission, could and would be tempted to shelter themselves under a banker's license, and some small business within the definition of a banker, and so the tax on brokers' sales, which was very large in its aggregate amount, and, therefore, an important source of revenue, would be defeated. Congress, therefore, declare, not only that brokers, but bankers doing business as brokers, shall pay the tax on their sales. So that, if bankers assume to sell merchandise or produce, as brokers therein, or to sell gold, stocks, &c., as brokers therein, they are subjected to the same tax on sales. Again, knowledge of the enormous extent to which sales are negotiated by brokers must be imputed to congress; and it is clear, I think, that the purpose of the law was, not to tax the private person engaged in other business, when he sold his own property (unless some other provisions included it), but to reach and tax the sales made by persons acting as brokers for a commission, and that it was enacted with knowledge that those sales, as to gold, stocks, bonds, and securities, would include by far the largest portion, and, probably, nearly all, that are made in the commercial cities where such business is transacted.

7th. It was largely assumed, on the argument, that, because the above cited subdivision 1 of section 79, prescribing a banker's license fee, and describing the persons who should pay it, described them as persons having a place of business where, among other things, "money is advanced or loaned on stocks, bonds, bullion, bills of exchange, or promissory notes, or where stocks, bonds, bullion, bills of exchange, or promissory notes are received for discount or sale," therefore, and irrespective of other specific provision, they are not taxable on the sales which they make. It seems to me quite obvious, that nothing in this subdivision does, per se, determine whether the sales here spoken of are taxable or not; and, were there another and general provision taxing all sales of stocks, bonds, &c., bankers must pay it, as well as other persons. They would

have such license to sell as this subdivision imports, but their sales would, nevertheless, be subject to any regulation of sales, whether by taxation or otherwise. No embarrassment, therefore, to a consideration of the question, what sales are taxable, arises from this subdivision of the act; and the door is wide open, to the operation of the section imposing the tax on sales of merchandise, produce, gold, bullion, stocks, &c., according to its proper interpretation. That section (99) hereupon declares, that all brokers, and bankers doing business as brokers, shall be subject to pay the duties specified "upon the sales of merchandise, produce, gold and silver bullion, * * * stocks, bonds, or other securities." This is in accordance with the view last suggested. It contemplates that bankers may sell property of the description enumerated, and that, when they engage in the business of selling as brokers, they shall be taxed, whether their sales are of merchandise, produce, stocks, or other of the specified property.

8th. The question, then, which is the test of the plaintiffs' liability to pay the tax is, whether they were doing business as brokers, within the proper meaning of the 99th section. It will be most convenient to consider this in reference to the third class of their transactions, as above divided, namely, buying stocks in their own names, for their customers, for a commission, advancing the purchase money on the security of what is called a margin, that is, a percentage of such price, deemed sufficient to secure them against loss, selling the stocks, for another commission, and settling the account according to the resulting balance to the credit of the customer, the whole being at the risk, and for the account, of the customer, as to profit or loss, and they having no interest therein, except their commissions and interest, or interest and commissions on their advances.

I have said on a former occasion, cited to me on this trial (Markham v. Jaudon, 41 N. Y. 235, 256), that, in such transactions as these, the actor is not a mere broker. I think so still. It is not a part of the duty or authority of the mere broker to make the purchase and sale in his own name. He is but a go-between or negotiator between two principals. It is not any part of his duty or office, as mere broker, to pay the price, or to assume any liability therefor. He binds his principal, or, oftentimes, both of the principals in the transaction, by his memorandum. He is, in short, a mere agent, acting by authority of another. And these same observations are true of other agents. It is, however, equally clear, that agents may make themselves liable on the contracts which they in fact make for others, either voluntarily or by not disclosing their agency. It would, nevertheless, be true, that their act of purchase and sale would be in execution of their authority as agent, and their principal would and must so treat it. They do not

cease to be agents therein, because they go further than, as agents, they were bound to go, and add their personal liability, in order to aid in the transaction. As between them and their principal they act in the relation of agents. So, they may, by express authority, or, it may be, by authority implied from the usages of trade (when such usages exist), receive the property purchased, and be themselves the instruments of making delivery, when they make sales; and, by consent of the principal, they may take formal title and convey that formal title to the purchaser, and may even convert the transaction, as between them, into an agreement for a speculation in stock in the name of the agent, for the account of his principal. While all these may be superadded to the duty and authority of a mere agent to buy and sell, there still remains the substantive fact, that, whatever effect these other attending circumstances may have, between him and his principal, as the result of the payment by himself, or of his taking title, the actual agency for his principal is not withdrawn from the transaction.

It is, however, claimed, that the definition of a broker, in section 79, subd. 9, excludes such transactions from the class of sales which are subject to tax; or, in other words, that the plaintiffs were not doing business as brokers, under that definition. The terms used are, "person, firm, or company, except such as hold a license as a banker, whose business it is, as a broker, to negotiate purchases or sales of stock, exchange, bullion," &c., &c., "for themselves or others, shall be regarded as a broker, under this act." I observe, upon this, that a banker, although he does the business which is declared to make a person a broker, is not to be deemed a broker, and to take out a license as such. That is the effect of the exception. When the banker is also doing business as a broker, he becomes chargeable with, not the license fee, but only the tax imposed on sales under the 99th section.

What, then, is doing business as a broker? This statute does not declare, further than this—one whose business it is, as broker, to negotiate purchases or sales of stock, &c. This does not tell us what it is "to negotiate purchases and sales, as broker." We must go further, before the definition becomes complete and explicit; and yet, I apprehend, it is not doubtful. On the contrary, it is so well understood, that what negotiating as broker meant required no definition. I have already indicated its meaning. The broker, as such, is the mere agent of a principal, in the negotiation of a purchase or sale. As mere broker, he has no responsibility, except for his own good faith and fair dealing. He, as mere broker, negotiates avowedly for some other, as principal. As mere broker, he neither takes nor gives title, neither receives nor delivers the property, and he has no interest in the transaction, except to earn

and receive his commissions. But he may do something more, and yet be a broker, in the acts of buying and selling for others. No one would, I think, suggest that he was less a broker, in buying and selling for another, if he consented to endorse the note of his principal, for the better security of the seller upon credit; or that he would be less a broker, in buying and selling, because his principal consented that, to secure him against loss by such endorsement, he might hold the property, or the title thereto; and, in this precise point of his agency, as broker, in buying and selling for his principal, for the account of such principal, as to profit and loss, and for a commission to himself, I am not able to perceive how superadding to his agency an advance of money to pay for the stock, can have any greater effect. It may be, that an agreement to buy stock in his own name, carry it, and sell it when directed, for the account of his customer, as to profit and loss, involves questions of right and duty between him and his principal, that are peculiar, and about which there may be difference of opinion. But, the agency in the act of buying and selling is always present, whatever legal consequences may flow from the circumstances superadded to the mere brokerage. In the aggregate transaction, he is a broker, and something more. He negotiates a purchase or a sale for another. He earns therein a commission. He has no interest in the profit or loss, when the whole transaction is carried into complete execution, according to the actual intent of the parties. If it were conceded that the transaction is a speculation in stock for account of the customer, which the agent agrees to make in his own name, and even though the agreement does not contemplate, as a practical result, that the stock will in fact come to the possession of the customer, this would not effect the view I take of the agency, as broker, in making the purchase and sale. The customer, on paying the price and all commissions, would, as matter of law, be entitled to receive the stock; and this was proved, on the trial, to be the recognized rule regulating the practice in such cases.

Speculation in stocks for account of others is not mentioned as belonging to the definition of the business of a banker, as defined in the statute. A portion of the business done by these plaintiffs was, no doubt, receiving stocks, bonds, &c., for discount or sale; but that by no means embraced mere speculations in stock, such as I am considering. In some transactions, also testified to on the trial, the plaintiffs sold stocks through a broker employed by them for the purpose. If those were all their sales, it would present a very different question. But they employed a broker only in exceptional cases, when they desired a sale at the "stockboard." I cannot doubt that it was the intention of congress to reach and include

what, I presume, constitutes very much the largest part of all the sales of stocks, gold, and some other property made in this country (and it is expressly proved that it constituted much the largest part of the plaintiffs' business), namely, speculation in the very manner of the transactions I am considering; and I think a just interpretation of the statute does include them. It follows, from these views, that the plaintiffs were, during the period, "doing business as brokers," and were, therefore, taxable for these sales.

II. If thus taxable, was the tax rightfully assessed upon all their sales, whether of their own property, or of the property of others coming to their possession, and held, for advances made by them as bankers, or purchased and sold on speculation for the account of others, on commission?

The supreme court have, I think, relieved me of any responsibility or embarrassment in deciding this question. The section imposing the tax is explicit, that "all brokers, and bankers doing business as brokers," shall pay the tax on the sales enumerated. In U. S. v. Cutting, 3 Wall. [70 U. S.] 441, the supreme court decided, that the sales of stocks, bonds, gold, &c., made by brokers for themselves, are subject to the same duties as those made for others. The statute places bankers doing business as brokers in the same condition in which it places brokers. In that respect, the terms are explicit, and this decision seems to me conclusive. It is true, that, in United States v. Fisk, Id. 445, at the same term, the supreme court decided that bankers who only sell for the United States, and for themselves, and who do not sell for others for a commission, are not liable to the taxes or duties imposed on sales. But the court is careful to discriminate between bankers who only sell for themselves and the United States, and bankers who sell for others for a commission, that is, bankers who do business as brokers. The plain implication from this case is, therefore, in exact accord with the case of U. S. v. Cutting [supra], and confirms the above statement of the effect of the decision therein.

III. The foregoing views necessarily result in a decision that the tax imposed upon and paid by the plaintiffs was legal, and that, for that reason, this action cannot be maintained. In acting upon that conclusion I do not find it necessary to consider the other grounds upon which the defendant urges a defence. The argument is certainly entitled to consideration, that, where a tax is paid to the defendant, as collector, without objection, or notice, in any form, that the party paying deems it erroneous, and the collector pays over the money to the government, he is not thereafter liable in an action to recover it back; and that objection or remonstrance made to the assessor, or his assistant, will not suffice. But, as to that, and as to the necessity of a formal appeal, I express no opinion, because, whether the defendant is or is not right on these points, the conclusion above stated disposes of the whole case.

IV. On the trial, evidence was offered by the defendant tending to show that it was a part of the regular and accustomed business of brokers in this country to purchase, carry and sell stocks for others upon commission, in the manner in question herein. That evidence was objected to by the plaintiffs, and was received subject to their objection, with the suggestion, that the consideration of the case would disclose the views entertained respecting its materiality. A witness, who, for twenty-five years, had been doing business as a broker, and who, I think, showed a sufficient acquaintance with the business of brokers in the leading cities in which the business of brokers is carried on, was examined on the subject. The act of congress not having, in terms, defined what it is to act or negotiate "as a broker," I deemed it competent evidence for the purpose of more clearly showing the general acceptation of the term which the legislature must have had in view.

The foregoing discussion, however, leads to the same conclusion, whether this testimony be received and considered, or not. I think the meaning of the term "broker" is well settled, independent of such evidence. The testimony, therefore, can be of no prejudice to the plaintiffs, even if it be held immaterial, and, if material, it is competent. Judgment must be entered for the defendant, with costs.